[Civ. No. 10925. Fourth Dist., Div. Two. Apr. 27, 1971.]

FRANK ORTEGA FLORES, Petitioner, v.
THE SUPERIOR COURT OF SAN BERNARDINO COUNTY,
Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Charles E. Ward, Public Defender, and William F. Fitzhugh, Deputy Public Defender, for Petitioner.

No appearance for Respondent.

Lowell E. Lathrop, District Attorney, and Michael Snyder, Deputy District Attorney, for Real Party in Interest.

## OPINION

**GARDNER, P. J.**—The defendant was charged with possession of heroin for sale and two prior felony convictions, possession of marijuana and selling a narcotic. He moved to dismiss the information under the provisions of Penal Code section 995. The motion was denied. He filed a petition for writ of prohibition in this court which was denied. He then filed a petition for hearing in the Supreme Court which court ordered that an alternative writ of prohibition issue to be heard by this court.

At 4:30 p.m. on September 16, 1970, Officers Hernandez, Ramirez and Germany of the San Bernardino Police Department were cruising in an unmarked police car[1] in Plaza Park in San Bernardino, an area of known narcotics activity. The officers were in plain clothes. Officer Hernandez was the principal witness at the preliminary examination and it is his testimony which will be summarized except as indicated. He testified from a diagram which is not a part of the record before us and some of the exact positions and directions may be erroneous. However, it appears that the following is a reasonably accurate summary of his testimony.

He first observed the defendant walking away from the area of the restroom.[2] He noticed that the defendant had a wadded object in his clenched fist which had about an inch sticking out. He had an admittedly purely speculative idea that the object might be a narcotics kit. The car in which the three officers were riding drove past the defendant and ahead of him. It appeared that the defendant was going to cross the street had he continued on his course of direction. However, the defendant looked in the direction of the police car and abruptly changed his direction of traveling away from the car and thus away from the street which he would have crossed had he continued in his prior course. The car containing the officers passed the defendant. At this point, the defendant changed the object from one hand to another and the officer testified, without objection, that he was "very clandestine about it." At all times the defendant kept looking at the car containing the police officers. The car passed the defendant again at which point Officer Hernandez put the car in reverse and the defendant walked away from the police car, reversing his direction from westbound to eastbound. Officer Hernandez put the car in forward gear, pulled alongside the defendant and stopped. He then called to the defendant, "Come here."

[1]The car was the only car used by the San Bernardino Police Department narcotics officers for "undercover" investigations.

[2]Originally, Officer Hernandez testified that he did not know the defendant but on further exploration into the matter, it appears that he did not know the defendant personally but had seen his picture in the paper. Since this information was not connected up with anything to indicate that the picture had anything to do with any narcotics activity on the part of the defendant, we consider that the record, to all intents and purposes, reflects that Officer Hernandez did not know the defendant.

He intended to say, "Come here, I want to talk to you." However, when he opened the car door, the defendant started running. Officer Hernandez testified that he did not identify himself as a peace officer or state the purpose of wanting to talk to the defendant because he did not have a chance to do so. The officer then chased the defendant who ran out of the park and into the backyard of a nearby house. On the way the defendant bumped into a hedge. He was finally stopped, the officers went back to the hedge (Officer Germany having seen the defendant throw an object at the time he hit the hedge) and found a wadded piece of magazine paper which contained two rubber balloons and six paper bindles of heroin, plus three five dollar bills. Officer Hernandez testified that the packaging of narcotics as described was the way narcotics were normally packed for sale.

■ The law in this field is reasonably clear. A police officer may detain and question persons when the circumstances are such as to indicate to a reasonable man in a like position that such a course of conduct is necessary to a proper discharge of his duties. This may be done although the officer has no probable cause to make an arrest. It should be noted that Officer Hernandez' purpose was to inquire and investigate, not to arrest. The test for the circumstances sufficient to allow detention and questioning is set forth in *Irwin* v. *Superior Court*, 1 Cal.3d 423 [82 Cal.Rptr. 484, 462 P.2d 12]. These circumstances: ". . . must be such as to distinguish the activity of the detained person from that of any other citizen and must be based on an objective perception of events rather than the subjective feelings of the detaining officers. (Citation.)

" '[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'

"Thus, a detention based on a 'mere hunch' is unlawful . . . 'There must be a "rational" suspicion by the peace officer that some activity out of the ordinary is or has taken place . . . some indication to connect the person under suspicion with the unusual activity . . . [and] some suggestion that the activity is related to crime.' [Citation.] Where the events are as consistent with innocent activity as with criminal activity, a detention based on those events is unlawful. [Citations.]" (*Irwin* v. *Superior Court, supra,* 1 Cal.3d 423, 426-427.)

The purpose of these rules is to avoid unreasonable intrusion into the lives of citizens and at the same time establish workable standards by which police officers may conduct criminal investigations. They were not created to handcuff the police nor were they evolved to unduly hamper them in reasonable activity to investigate crime. Neither were they evolved to give blanket protection from police intrusion to the person whose conduct

reasonably arouses suspicion. It is with the application of these broad rules to the facts and circumstances of the individual case that reasonable minds may differ. It is at this point that the conduct of the officer is "subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in the light of the particular circumstances." (*Irwin* v. *Superior Court, supra,* 1 Cal.3d 423, 427.) But this detached scrutiny must be made by judges who are aware of the sometimes harsh reality of life in the streets, not life as it exists in the protected and somewhat cloistered life on the bench.

With the above guidelines in mind, we examine the actions of the officers in this case. We must bear in mind their specialized knowledge, and discuss the specific and articulable facts available to them, together with reasonable inferences to be drawn from those facts, to ascertain whether or not the action of Officer Hernandez in saying, "Come here," was such an intrusion into the life of the defendant as to be constitutionally impermissible. If the officer had the right to say to the defendant, "Come here," then the defendant's actions in running away would be an additional circumstance which would obviously allow the subsequent detention and arrest. (*People* v. *Martin,* 46 Cal.2d 106 [293 P.2d 52]; *People* v. *Siegenthaler* *(Cal.App.) 93 Cal.Rptr. 303; *People* v. *Taylor,* 174 Cal.App.2d 448 [344 P.2d 837].) ■ While it might be argued with considerable merit that the mere speaking to an individual by a police officer, as was done in this case, is not a sufficient intrusion into that individual's life to put into effect the rules of detention, we will, for the purpose of our discussion, assume that the words used in this case were a sufficient show of authority to apply the rules of detention.

■ First, we start with the area—an area known to the officers to be one of considerable narcotics activity. Thus, to the trained officer seeing someone pass a transparent bag containing a leafy substance to another and receive money in exchange is to be judged in the environment in which the transaction took place. Seeing that transaction take place in an area of known narcotics activity is a suspicious circumstance. Seeing the same transaction take place on the floor of a Chicago Grain Exchange would probably (and hopefully) be meaningless.

Second, the appearance of the officers. We must keep in mind when evaluating the conduct of the officers the concurrent conduct of the defendant and the officers' awareness of that conduct. Those involved in the narcotics trade are a skittish group—literally hunted animals to whom everyone is an enemy until proven to the contrary. Thus, the average law

---

*A hearing was granted by the Supreme Court on April 22, 1971.

abiding citizen seeing three grown men sitting in a slow moving car at 4:30 in the afternoon would give them no more than a passing glance. But to the person involved in the narcotics traffic, three men in plain clothes, riding in an unmarked car,[3] cruising at a slow speed in an area of high narcotic activity are about as inconspicious as three bull elephants in a backyard swimming pool. Any normal person in the narcotics culture would assume them to be "narcs."

With these first two factors in mind, we pass to our third factor—the activity of the defendant in this case. We should remember that there were others in the park whom the officers studiously avoided. It was the activity of the defendant that brought himself to their attention. The defendant upon seeing the car did not give it the passing glance of the upright, law abiding citizen. His eyes were glued on that car. To him, it represented danger until proven otherwise. When it appeared that the car was going to intercept him had he continued on his path, he changed his course of travel and walked away. When the car again neared him, he again altered his course and proceeded in a different direction. At the same time, he was making these changes in his course of travel and watching the police car closely, he changed an object in his hand, which the officer without any articulable reason thought was a narcotic kit, to another hand in a "very clandestine" manner. By this time there is obviously no question in the defendant's mind as to who the three gentlemen in the car were. When the officer shouted, "Come here," it was, to him, a show of authority. Just as obviously, the defendant knew they were police officers as reflected by his subsequent and almost instantaneous behavior. As indicated above, the question is, knowing what the officers knew at the time, did they have reasonable ground to make a show of authority? We hold that they did. It should be made clear that we are dealing with only the very slightest type of an intrusion; we are not dealing with a physical detention, a search, an arrest or even a questioning. The defendant's behavior precluded any of the latter until after his dash for freedom. What might have ensued and what the rights of the parties to this litigation might have been had he stood his ground are not before us. He did not stand his ground.

The instant case is distinguishable from those cases in which it has been held that the intrusion of the officer was unreasonable.

In *Cunha* v. *Superior Court,* 2 Cal.3d 352 [85 Cal.Rptr. 160, 466 P.2d

---

[3]An imponderable facet to this case is the fact that the car, being the only one used in narcotics investigations, may have been readily identifiable to anyone in the local narcotics picture. However, for our purposes, we will consider it as "unmarked."

704], the officers upon seeing activity on the part of the defendant which they thought was suspicious did not detain or question, they promptly arrested, a considerably more aggravated intrusion into the life of the citizen than the minimal intrusion described in the instant case.

In *People* v. *Moore,* 69 Cal.2d 674 [72 Cal.Rptr. 800, 446 P.2d 800], the defendant was making a telephone call in a phone booth and upon seeing the officers in a police car turned his back to the police officers and appeared nervous. This is far short of the erratic and evasive conduct of the defendant in this case. In *Moore,* the court observed that "Defendant was talking on a telephone in a booth at ten in the morning, and there seems little to distinguish defendant from any other citizen who may have been making a telephone call at that time and place." (*People* v. *Moore,* *supra,* p. 683.) Here, as described above, there was considerable to distinguish the defendant from any other citizens who may have been walking in the park at that particular time.

In *Irwin* v. *Superior Court, supra,* 1 Cal.3d 423, the defendant was merely standing beside some luggage in the lobby of an airline. Another individual had shipped a box of marijuana. Apparently, since the defendant's luggage contained the next sequential number to that of the individual who had shipped a box of marijuana, the officers had a hunch that since marijuana shippers might travel in pairs that the defendant might be carrying marijuana. The only circumstance tying the defendant to the individual that shipped marijuana was that his was the next numbered baggage tag. As the court observed, all this meant that he was the next passenger in line at the baggage check-in counter.

*Remers* v. *Superior Court,* 2 Cal.3d 659 [87 Cal.Rptr. 202, 470 P.2d 11], was again a situation where the officers did not question or detain, they promptly arrested. While there is considerable language in that opinion which is critical of some of the factors presented by the Attorney General to justify the arrest, the square holding of the case is concerned with probable cause to arrest, not probable cause to make the somewhat minimal show of authority of detaining the defendant. We must take issue with the statement of the petitioner that the court in *Remers* held that the circumstance there disclosed that there was not enough to stop and detain the defendant in that case. As we have indicated that was the case of an arrest, not a detention.

In the instant case the officer was in possession of sufficient, specific and articulable facts which, together with rational inferences from those

facts, reasonably warranted the minimal intrusion into defendant's life by the officer yelling at him.

Petition denied.

Kerrigan, J., and Tamura, J., concurred.